IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>SIONE POUHA,<br><br>　　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER AMENDING THE COURT'S PREVIOUS ORDER ON DEFENDANT'S MOTION TO COMPEL**<br><br>Case No. 2:23-cr-00170 TC<br><br>Judge Tena Campbell |

　　　　Before the court is a motion to amend the court's order dated August 26, 2024, in which the court granted Defendant Sione Pouha's motion to compel the production of physical evidence for DNA testing. (Mot. Amend, ECF No. 69; Mot. Compel, ECF No. 54; Order, Aug. 26, 2024, ECF No. 65.) For the reasons stated below, the court grants that motion and orders the United States to produce certain swabs for the defense to send to Sorensen Forensics for testing.

### BACKGROUND

　　　　Mr. Pouha is charged with one count of Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(1). The charge is connected to an incident that occurred at this courthouse. The government plans to prove that on April 30, 2023, just before 4:00 a.m., court security officers observed—over a live video stream—an individual on the northwest patio of the courthouse, who pulled out a gun and began to shoot at a group of people walking near the court. (Gov't Resp. Mot. Compel, ECF No. 59 at 2–3.) The shooter, who appeared to be a man, was wearing a jacket. (Id. at 4.) After firing the gun, the shooter ran

1

through the courthouse grounds and past the guard station on the southeast side where the security officers were stationed. (Id.) The officers saw the shooter squat down on the east side of the court's parking ramp before running away. (Id.)

During a search for the shooter a short time after, officers from the Salt Lake City Police Department discovered Mr. Pouha moving through the bushes at the Little America Hotel and then attempting to hide in the underground parking structure. (Id. at 4–5.) He was not wearing a jacket, but officers later found a jacket on the north side of the hotel between a bush and a brick wall. (Id. at 5.) Meanwhile, back at the courthouse, a third security officer found a semiautomatic pistol near the guard station where the other security officers had seen the shooter squatting down. (Id. at 6.)

The gun was later processed by the Salt Lake City Police Department Crime Lab. (Id. at 7.) The lab did not find any fingerprints on the weapon. (Id.) And while the lab swabbed the gun for DNA evidence,[1] it has not had those swabs tested. (Id.)

A grand jury indicted Mr. Pouha on May 3, 2023. (Indictment, ECF No. 1.) His case has been on the verge of trial at multiple points. On March 25, 2024, Mr. Pouha moved to continue his trial—after the court had issued summons to jurors—so that his counsel could enhance the court's security footage, an enhancement that appears to have been inconclusive. (See Def.'s Mot. Continue, ECF No. 41; Min. Entry, Mar. 27, 2024, ECF No. 46.) To accommodate a government witness, the court then moved the trial date to September 16, 2024. (Min. Entry, Apr. 4, 2024, ECF No. 50.) A month before that trial, Mr. Pouha moved to compel

---

[1] At the August 21, 2024 hearing described below, the United States indicated that it used both a wet swab and a dry swab to test the gun.

2

the production of certain DNA evidence. (ECF No. 54.) Specifically, Mr. Pouha's counsel asked the United States to make the gun available for DNA testing.

The court held a hearing on August 21, 2024, at which the parties agreed that the United States would provide the gun to the defense to take swabs, which the defense would then send to Sorensen Forensics for testing. (Min. Entry, Aug. 21, 2024, ECF No. 61; ECF No. 65.) A month later, Mr. Pouha moved the court to amend its order, asking the court to require that the Salt Lake City Police Department take additional swabs from the gun and then send those swabs to Sorenson Forensics. (ECF No. 69.)

The court held another hearing, on September 24, 2024, at which Mr. Pouha's counsel noted that the defense was finding it difficult to locate someone who was qualified to take swabs from the gun. (Min. Entry, Sept. 24, 2024, ECF No. 70.) The government, in turn, argued that it could not be compelled to swab the gun for Mr. Pouha. Mr. Pouha's counsel then suggested that the government could simply turn over the swabs that it had already taken from the gun. The government responded that it had already addressed this argument in its briefing on the first motion to compel. The government maintained that the defense had not established that the swabs were material to the preparation of the defense, and that therefore the court could not compel the government to turn over these swabs.

**ANALYSIS**

The motion to compel implicates the current state of the science surrounding touch DNA evidence—in other words, DNA that comes from epithelial cells and not from bodily fluids. "Touch DNA will often be available in much smaller quantities than DNA extracted from blood, semen, or hair." Touch DNA; Trace DNA, 7 Jones on Evidence § 60:9 (7th ed.). Nevertheless, courts have held that "[t]ouch DNA [can] be persuasive evidence of … innocence." United

States v. Watson, 792 F.3d 1174, 1179 (9th Cir. 2015).  It can also be inculpatory.  The Tenth Circuit upheld the admissibility of touch DNA evidence in a bank robbery case in which a forensic scientist found the defendant's DNA on a zip tie used to restrain a bank teller.  United States v. Brooks, 727 F.3d 1291, 1299 (10th Cir. 2013).  The detected DNA must have been touch DNA, as the scientist "did not see any evidence on any of the zip ties of any sort of fluid, such as blood, saliva, or semen."  Id. at 1295 (cleaned up).  But rather than rejecting the evidence for this reason, the court instead characterized it as "unassailable evidence" that "strongly indicate[d] that [the defendant] was present in the bank at the time of the robbery[.]"  Id. at 1306.

Depending on the circumstances, then, touch DNA evidence can be probative of a defendant's guilt.  But its use raises a number of questions due to the relatively low quantity of DNA that is generally present on samples.  For instance, courts have considered expert testimony that it is not scientifically advisable to split swab samples when analyzing touch DNA evidence because "the most scientifically sound approach is to extract all of the DNA on low quantity DNA samples to maximize the possibility of obtaining probative DNA information that can be used by both parties."  United States v. Quinones, 236 F. Supp. 3d 375, 377 (D.D.C. 2017).  Based on this testimony, the Quinones court held that there would be no bad faith on the part of the government even if the prosecution consumed the entirety of a sample when conducting a DNA analysis.  Id. at 378.

But here, the prosecution does not intend to conduct any DNA analysis.  Instead, the parties present a separate issue—namely, whether the prosecution must allow for testing if it does not plan to introduce this evidence itself; and, if so, what steps the prosecution must take to assist the defense in conducting these tests.

As a preliminary matter, the court notes that the question before the court has shifted over the course of the proceedings. The defense originally requested—a request to which the United States did not object—that the gun be made available to take additional swabs. The parties were unable to agree who should take these additional swabs and asked the court to decide that question. But upon closer examination of the issues surrounding touch DNA evidence, the court finds that it would be futile to take additional swabs. Because the United States has already taken both dry and wet swabs, the likelihood that any DNA remains on the gun is extremely low. The court fails to see how any probative evidence could be obtained from additional swabs. The court therefore need not address whether and how the government should assist the defense to obtain additional swabs.

But given this finding, a separate issue arises—one that the prosecution anticipated was the real question underlying the defendant's motion and which defense counsel suggested at the September 24, 2024 hearing: why should the court not order the prosecution to provide the defense with the two swabs that have already been taken?

The United States argues against such an order for two reasons. First, the government asserts that Mr. Pouha has not shown that the swabs are material to the preparation of his defense. Second, the prosecution maintains that turning over the swabs would be tantamount to compelling the government to engage in testing. The court addresses each of these arguments in turn.

Under Rule 16 of the Federal Rules of Criminal Procedure, the government must permit a defendant to inspect data and tangible objects within the government's possession or control if "the item is material to preparing the defense" or "the government intends to use the item in its case-in-chief at trial[.]" Fed. R. Crim. P. 16(a)(1)(E). To demonstrate materiality, a defendant

must show "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." United States v. Scott, No. 92-6272, 1993 WL 411596, at *3 (10th Cir. 1993) (citing United States v. Ross, 511 F.2d 757, 763 (5th Cir. 1975), cert. denied, 423 U.S. 836 (1975)).

The court finds that the swabs do have the potential to alter the quantum of proof in Mr. Pouha's favor—but not precisely for the reasons articulated by the defense. The parties have focused on two possible results of DNA analysis. They agree that the detection of Mr. Pouha's DNA on the gun would be inculpatory but disagree about the implications of a test that does not find any DNA from Mr. Pouha. If this latter scenario is true, the court agrees with the prosecution: there are multiple reasons why Mr. Pouha's DNA would not be on the gun even if he handled it—including that he may have been wearing gloves and that there was simply not enough DNA to yield a clear result. Therefore, a test that fails to detect any DNA would be only mildly probative of Mr. Pouha's innocence at best. But there is a third possibility: namely, that the test reveals a clear DNA profile of someone who is not Mr. Pouha. Although such a result would not be conclusive evidence that Mr. Pouha never handled the gun, it would significantly alter the quantum of proof in Mr. Pouha's favor.

Tenth Circuit rulings are consistent with this finding. In United States v. Roberts, the Tenth Circuit considered an appeal from a defendant convicted of being a felon in possession of a firearm who claimed that his trial counsel was ineffective for failing to test the relevant gun for DNA evidence. 417 F. App'x 812, 822–23 (10th Cir. 2011). The Tenth Circuit also reviewed the district court's decision denying the defendant's motion for DNA testing, a motion that the defendant made as part of a motion for a new trial after the jury returned a guilty verdict but before sentencing. Id. at 817–18. The Tenth Circuit upheld the district court's decision to deny

DNA testing and found that the defendant's counsel had not been ineffective.  Id. at 823–24.  The court noted: "DNA testing alone does not always resolve a case.  Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent."  Id. at 824 (quoting Dist. Attorney's Office for the Third Jud. Dist. v. Osborne, 557 U.S. 52, 62 (2009)).

But the Tenth Circuit's ruling hinged on the specific facts of the case, which included independent evidence establishing that the defendant, Robert F. Roberts, possessed the gun:

> Eyewitness testimony established Roberts disposed of the gun; Pena and Thatcher testified they were certain they saw Roberts throw the gun into the dumpster. The gun was found on the top of the trash in the dumpster moments after Roberts was apprehended. … Given these facts, we cannot find the result of the trial was unreliable or that further testing would produce a "reasonable probability" Roberts did not possess the gun.

Id.  And in part due to the presence of the eyewitnesses, the Tenth Circuit approved of the defense counsel's trial strategy:

> It was not unreasonable for counsel to avoid the potentially damaging evidence which could result from further investigation should Roberts' DNA be found on the gun.  As it turned out, counsel was able to elicit favorable testimony that the DNA swabs were submitted for testing, but no DNA evidence was offered at trial.  Counsel's strategy was sound.

Id. at 823.  Despite this independent evidence of the defendant's guilt, the Tenth Circuit conceded that "evidence of some other person's DNA would have bolstered Roberts' theory of the case" even if "it would not have ruled out his guilt."  Id.

Here, Mr. Pouha brings his motion before trial and the court must consider his request only under the materiality requirement of Rule 16, not in the light of the high bar a defendant must overcome to overturn a jury verdict.  Moreover, there is no independent eyewitness testimony linking Mr. Pouha to the gun as there was in the Roberts case—instead, there is video

footage that the defense maintains is not clear enough to depict Mr. Pouha. The presence of someone else's DNA on the gun would therefore bolster Mr. Pouha's theory of the case.

The other cases cited by the United States do not suggest a different result. In LaFevers v. Gibson, the Tenth Circuit rejected a claim for ineffective assistance of counsel where DNA testing would at most prove "whether Petitioner was bleeding at the time he was at the crime scenes or whether Petitioner bled on the clothing found in [co-defendant's] home." 182 F.3d 705, 722 (10th Cir. 1999). There was no argument in the case that DNA testing would reveal the presence of a third person besides the two co-defendants.

And in United States v. Deiter, the Tenth Circuit upheld a trial court's decision to deny a motion to compel DNA testing where the motion was asking only for DNA samples from the arresting police officers to advance the defendant's theory that the police officers had transferred the defendant's DNA onto the relevant holster and revolver. 576 F. App'x 814, 815–16 (10th Cir. 2014). The Tenth Circuit noted that the defendant had adequately argued this theory to the jury because DNA testing of the holster and revolver had revealed DNA from an unidentified source, which the defendant suggested was from the police offers:

> [The defendant] was then able to use the presence of DNA from an unidentified source on the holster and revolver to argue that secondary transfer was responsible for the presence of Mr. Deiter's DNA on those items. Specifically, he argued that one of the officers picked up some of Mr. Deiter's DNA during the attempts to subdue and handcuff him and then transferred it with his or her own DNA—the unidentified sample—onto the holster and revolver. The lack of DNA samples from the officers did not prevent the defense from presenting a robust secondary transfer theory.

Id. at 816. Although the Tenth Circuit did not find that additional DNA testing was warranted, the case demonstrates that the gun and holster were tested for DNA—and that the presence of an unidentified source of DNA was crucial to the defense's theory of the case. While Mr. Pouha

8

does not argue a secondary transfer theory here, Deiter certainly does not stand for the proposition that an initial DNA test of the weapon involved in the felon in possession charge is immaterial to the defense's preparation of its case.

Finally, the United States points to Arizona v. Youngblood, in which the Supreme Court held that "the police do not have a constitutional duty to perform any particular tests." 488 U.S. 51, 59 (1988). The court agrees with this point: the United States is not required to test the gun for DNA itself. But where the defense can show that DNA testing could bolster its theory of the case and offers to perform that testing itself, the court finds that Youngblood supports granting a motion to compel production of DNA swabs that have already been taken and are in the government's control. Youngblood distinguished between evidence of known exculpatory value, which much be disclosed to the defendant, and "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Id. at 57. The Court held that the bad faith destruction of such potentially exculpatory evidence would constitute a denial of due process of law. Id. at 58. Here, it is difficult to see a functional difference between the bad faith destruction of the swabs that the government has already taken and the government's refusal to either test those swabs or provide them to the defendant for testing. At most, the United States can argue that Youngblood is inapposite because the results of DNA testing would not necessarily exonerate Mr. Pouha—even if that testing revealed that Mr. Pouha's DNA was not on the gun and someone else's DNA was. But nothing in Youngblood suggests that the government may destroy the DNA swabs in bad faith or withhold those swabs from the defense where the defense has adequately demonstrated materiality.

The court finds that this case would be uncontroversial if there had been blood on the gun. Even though the presence of an unknown individual's blood would not be entirely dispositive of Mr. Pouha's innocence, it would constitute <u>Brady</u> evidence that must be disclosed to the defendant. See <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). DNA testing of blood is much more likely to reveal a specific DNA profile due to the higher concentration of DNA involved, whereas touch DNA is available in smaller quantities and therefore less likely to yield a conclusive result. But the smaller likelihood that touch DNA analysis will result in exculpatory evidence is not so low that this type of testing is immaterial to the preparation of the defense. The court need not decide at this time whether the results of touch DNA testing will be admissible—but because those results could significantly alter the quantum of proof in the defendant's favor, Mr. Pouha may demand that the swabs be provided for testing.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1. The Defendant's Motion to Amend Order (ECF No. 69) is GRANTED.

2. The court orders the United States to turn over the DNA swabs for testing.

3. The defense has previously indicated that Sorenson Forensics could analyze the swabs within 30 to 60 days. The court therefore sets a status conference for May 14, 2025, at 11:00am in Courtroom 3.400, at which time it will set this matter for trial.

DATED this 10th day of March, 2025.

BY THE COURT:

_/s/ Tena Campbell_
Tena Campbell
United States District Judge